# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00089-CV

**Dovie L. Williams, R. N., Appellant**

**v.**

**Texas Board of Nursing, Appellee**

### FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-19-008240, THE HONORABLE MAYA GUERRA GAMBLE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Dovie L. Williams, a nurse licensed by the Texas Board of Nursing (the Board), filed a suit for judicial review of the Board's final order in an administrative disciplinary proceeding. The Board found that Williams engaged in conduct that warranted the sanction of a warning with certain stipulations to her continued practice of nursing, prompting Williams's suit. After a hearing, the district court affirmed the Board's order. Williams, appearing pro se, perfected this appeal. We will affirm the district court's order.

## BACKGROUND

The Board brought charges against Williams for alleged violations of the Texas Nursing Practice Act (the Act) and Board rules in her care of three patients in the intensive care unit of Park Plaza Medical Center in Houston. *See* Tex. Occ. Code § 301.452(b) (listing grounds for disciplinary action). The Board's charges included that, regarding Patient 1, Williams failed

to timely perform "stat" lab draws for the patient as ordered by the physician and in accordance with Park Plaza policy. The Board alleged that the delay in ordering the lab draw deprived the physician of necessary medical health information for the patient, unnecessarily delayed the onset of needed medical care, and constituted a violation of subsections 301.452(b)(10) and (13) of the Act and Board rules 217.11(1)(A), (B), (C), and (M) and 217.12(1)(A), (B), and (4). *See id.* §§ 301.452(b)(10) (subjecting person to disciplinary action for "unprofessional or dishonorable conduct that, in the board's opinion, is likely to deceive, defraud, or injure a patient or the public")[1], (13) (subjecting a person to disciplinary action for "failure to care adequately for a patient or to conform to the minimum standards of acceptable nursing practice in a manner that, in the board's opinion, exposes a patient or other person unnecessarily to risk of harm"); 22 Tex. Admin. Code §§ 217.11(1)(A) (Texas Bd. of Nursing, Standards of Nursing Practice) (including within standards of nursing practice that nurses shall "know and conform to the Texas Nursing Practice Act and the board's rules and regulations"), (B) (including within standards of nursing practice that nurses "implement measures to promote a safe environment for clients and others"), (C) (including within standards of nursing practice that nurses "know the rationale for and the effects of medications and treatments and shall correctly administer them"), (M) (including within standards of nursing practice that nurses shall "institute appropriate nursing interventions that might be required to stabilize a client's condition and/or prevent complications"), .12(1)(A) (Texas Bd. of Nursing, Unprofessional Conduct) (defining "unprofessional conduct" to include failing to practice nursing in conformity with minimum

---

[1] In 2017, the Legislature amended subsection 301.452(b)(1) to remove the reference to dishonorable conduct and add a requirement that the conduct must occur in the practice of nursing. Citations in this opinion are to the version of the Texas Occupations Code in effect in 2016, the time of the conduct alleged by the Board.

standards in rule 217.11), (B) (defining "unprofessional conduct" to include failing to conform to accepted nursing standards in applicable practice settings), .12(4) (defining "unprofessional conduct" to include conduct that "may endanger a client's life, health or safety" and providing that "actual injury to a client need not be established").[2]

The Board also charged that, regarding Patient 2, Williams failed to transfuse to the patient one unit of packed red blood cells as ordered by the physician; failed to document the patient's medical records and the reason for not initiating the blood transfusion; and failed to clarify with the physician that the transfusion was not given to the patient even after Williams had established intravenous access for the patient. The Board alleged that this conduct created an incomplete medical record, deprived the physician of necessary medical health information for the patient, unnecessarily exposed the patient to a risk of harm, and constituted a violation of subsections 301.452(b)(10) and (13) of the Act and Board rules 217.11(1)(A), (B), (C), (D), (M), and (P) and 217.12(1)(A), (B), and (4). *See* Tex. Occ. Code §§ 301.452(b)(10), (13); 22 Tex. Admin. Code §§ 217.11(1)(A), (B), (C), (D) (including within standards of nursing practice that nurses shall accurately and completely report and document nursing care rendered and administration of medications and treatments), (M), (P) (including within standards of nursing practice that nurses shall "clarify any order or treatment regimen that the nurse has reason to believe is inaccurate, non-efficacious or contraindicated by consulting with the appropriate licensed practitioner and notifying the ordering practitioner when the nurse makes the decision not to administer the medication or treatment"); .12(1)(A), (B), .12(4). The Board also alleged that Williams failed to perform a blood glucose check on Patient 2 at bedtime as

---

[2] Citations in this opinion are to the versions of the relevant provisions of the Texas Administrative Code in effect in 2016, the time of the conduct alleged by the Board.

3

ordered by the physician; performed the blood glucose check at a different time; and failed to document the reason for not performing the check at bedtime or the reason for conducting the test at a different time. The Board alleged that this conduct violated subsections 301.452(b)(10) and (13) of the Act, as well as Board rules 217.12(1)(A), (B), and (4). *See* Tex. Occ. Code § 301.452(b)(10), (13); 22 Tex. Admin. Code §§ 217.12(1)(A), (B), .12(4).

The Board also alleged that, regarding Patient 3, who was transferred to the Park Plaza intensive care unit from a long-term care facility, Williams failed to reconcile the patient's medications, failed to completely and appropriately document the patient's history and current medication list, and failed to communicate the patient's home medications to the hospital's intensive care unit physician, causing the patient to miss a dose of an antibiotic medication. The Board alleged that this conduct was likely to injure the patient because subsequent caregivers did not have accurate and complete information on which to base their decisions for further care and because failing to administer a medication as ordered by the physician could result in non-efficacious treatment. The Board alleged that this conduct violated subsections 301.452(b)(10) and (13) of the Act and Board rules 217.11(1)(A), (B), (C), (D), and (P) and 217.12(1)(A), (B), and (4). *See* Tex. Occ. Code § 301.452(b)(10), (13); 22 Tex. Admin. Code §§ 217.11(1)(A), (B), (C), (D), (P); .12(1)(A), (B), .12(4).

Williams disputed the charges, and the matter was referred to the State Office of Administrative Hearings (SOAH) for a contested case hearing. *See* Tex. Occ. Code § 301.454. At the hearing, the ALJ heard testimony from the following witnesses: (1) Shu Wang, a registered nurse who worked with Williams in the intensive care unit as a staff nurse and as a house supervisor; (2) Deborah Thompson, a registered nurse who worked as the director of Park Plaza's intensive care unit and was Williams's supervisor; (3) Kristin Benton, the Board's

4

Director of Nursing and a registered nurse; (4) Luis Camacho, a physician specializing in the care and treatment of patients in intensive care; and (5) Williams.

Regarding the Board's allegation that Williams failed to draw a stat lab ordered by a physician for Patient 1, the ALJ admitted into evidence relevant portions of Park Plaza's electronic medical records that showed that Dr. Thinh Vo ordered stat lab draws for Patient 1 at 7:36 p.m. and 7:37 p.m. on September 28, 2016. Thompson testified that Williams, as the nurse on duty at the time, was responsible for making sure the orders were completed. Thompson explained that a stat order for a blood draw means it must be done immediately, usually within 30 minutes, and that stat orders could be useful in treating bleeding, breathing problems, renal function, and stress levels, and that delay in obtaining the requested specimens could result in delayed treatment of the patient. Thompson stated that stat orders are represented by a specific icon in the computer system, which makes them readily identifiable to a nurse. Additionally, when a stat order is entered for a patient in the intensive care unit, a label for the blood draw is immediately printed out at a location near the patient, which serves as a second visual indication that a stat order has been entered.

Thompson explained that physicians give orders either orally if present at the hospital or by using the hospital's online order system. The hospital's online order system uses "pop-up" icons on the patient's chart to indicate that an order has been entered. Thompson stated that nurses are notified of pending orders during the patient "hand off" process during shift changes, but that nurses are expected to confirm that there are no pending orders at the beginning of their shift and also to continually check the patient's medical records during their shift for new and outstanding past orders.

5

Thompson stated that Dr. Vo complained to her about Patient 1's stat lab being late, causing her to investigate the matter. Thompson testified that she reviewed the orders for Patient 1, that the stat lab orders were present in the records, and that there was no indication that Williams had timely completed them. Thompson explained that the hospital's electronic records system showed an entry of "Authentication/Order Review" on each of the patient's electronic records that reflected that Williams had opened the orders at 7:50 p.m. However, Thompson testified that it appeared that Williams did not complete the orders until 6:20 a.m. the following morning. The hospital's informatics nurse informed Thompson that the electronic medical records reflected that although Williams had viewed the list of orders for Patient 1, she did not scroll down to older orders where she would have seen the stat order entered by Dr. Vo.[3] The informatics nurse also informed Thompson that Williams did not open the Patient Activity List program, which contained a task list that would have alerted Williams to the stat orders, until 5:10 a.m. the morning after Dr. Vo had ordered the stat lab. When Thompson questioned Williams during her investigation, Williams reported that she was not told about the stat lab orders, did not see the orders, and denied that the task appeared on the computer's Patient Activity List work screen. Thompson testified that, after completing her investigation, she documented her findings and conclusion that Williams had failed to follow Dr. Vo's order to draw stat labs.

Williams testified that she did not perform the stat lab order because there was no task indicator on the computer showing that a stat lab draw was needed, and no label for a stat draw had printed in the intensive care unit. Williams also stated that the nurse transferring care

_____

[3] The time that Williams accessed the orders was determined by reviewing screen shots of the orders file in the hospital's electronic medical records information system that identify the date and time items were reviewed.

6

of Patient 1 from another hospital unit to the intensive care unit did not mention the stat lab draw orders. Williams testified that she told Thompson that Dr. Vo might have actually written an order for the lab draw to be done in the morning, instead of as a stat order and explained that this could have happened because the computer program was new and there had been some problems with it. Williams stated that computer errors should not be blamed on the nurse.

Based on this evidence, the ALJ found that Dr. Vo ordered stat lab draws for Patient 1 on September 28, 2016, that the orders were entered into Park Plaza's electronic medical records, and that Williams did not complete the stat lab draws until September 29, 2016, at 6:20 a.m., approximately eleven hours after the orders were entered. The ALJ also found that Williams viewed the list of orders for Patient 1 at 7:50 p.m. on September 28 but did not scroll down the list to view the older orders, which contained the stat orders. The ALJ found that Park Plaza's electronic information system reflected that Williams did not open the Patient Activity List—a task list showing orders and other items to be completed by the nurse—for Patient 1 until 5:10 a.m. on September 29, 2016.

Regarding the Board's allegation that Williams failed to transfuse a unit of packed red blood cells to Patient 2, Wang testified that on the morning of October 7, 2016, she learned that a blood transfusion had not been given to the patient as ordered by a physician. Wang stated that a different nurse, Vladimir Moroz, had taken care of Patient 2 the previous day and was supposed to give the "hand off" report to Williams when his shift ended. Williams had not reported to work before Moroz left after his shift ended, so he wrote a detailed report that Camacho had ordered that Patient 2 be given a unit of blood. Moroz left his personal cell number so Williams could call him if she had any questions about the order. Wang testified that Williams did not call Moroz and did not transfuse the unit of blood.

7

Wang explained that one of Park Plaza's "best practices" was to prevent over-transfusion of blood, and that to accomplish that, a physician was required to provide a justification for ordering a blood transfusion for patients with a hemoglobin level of 7 or greater. Wang testified that Camacho's order included the following language providing the justification for the transfusion to Patient 2, whose hemoglobin was greater than 7: "hemoglobin 7 or above w/organ ischemia, 1 units [sic]." Wang explained that ischemia is a lack of blood flow that can cause organ damage and this was the justification for ordering a transfusion for Patient 2 even though the patient's hemoglobin was greater than 7. Wang stated that when she talked to Williams about the failure to transfuse a unit of blood to Patient 2, Williams told her that she interpreted the order as saying to transfuse Patient 2 only if the patient's hemoglobin level was lower than 7, which it was not. Wang testified that, because that was not what the order said, she believed that Williams either did not read the order at all or did not read it correctly. Wang also stated that if the language of the order was confusing to Williams, she should have called Camacho for clarification, which she did not do.

Thompson testified that she received an email from Wang reporting Williams's failure to give the transfusion as ordered. Thompson stated that Camacho ordered the blood transfusion to treat organ ischemia, thereby justifying transfusing blood to a patient with a hemoglobin level greater than 7. Thompson stated that the order was not an instruction for the conditions that needed to exist for the transfusion but simply a reason for the order. Thompson testified that it was inappropriate for Williams to interpret the order as she did and decide not to perform the transfusion. Although the nurse on duty prior to Williams's taking over care of Patient 2 had not established an intravenous access line for the transfusion before his shift ended, Thompson believed that Williams was not abnormally busy with patients during her shift and

8

that there was no justification for her failure to perform the transfusion. Thompson stated that if Williams had difficulty complying with the transfusion order, standard nursing practices required that she ask other nurses or the physician for help, which she did not do.

Camacho testified that when he left Patient 2's room after issuing the transfusion order he asked Williams to transfuse the patient. Williams told him that she was waiting for intervention radiology to place a central line in the patient because the patient did not have intravenous access for the transfusion. Camacho stated that he told Williams that maintaining the patient's blood pressure and organ function was a higher priority than receiving the transfusion and that he understood that it was not possible to immediately administer a transfusion when the order was written because the patient's only intravenous access was being used to administer other medications. Camacho testified that he clarified to Williams that once there was an available intravenous access, he wanted the unit of blood to be transfused. Camacho stated that when he returned to the hospital the next morning, he believed that the patient had received the blood transfusion. In fact, Patient 2 had not received the ordered transfusion.

Camacho testified that he did not discuss the matter with Thompson because he had been satisfied with how the treatments had been prioritized and believed that if the transfusion had not been done when it was ordered it was because of the lack of an intravenous access line and not because of a nursing omission by Williams. Camacho testified that he never wrote an order to discontinue the blood product and expected that the patient would receive a blood transfusion after intravenous access was established.

Williams did not dispute that she failed to transfuse the blood to Patient 2 and testified that she misread the order for the blood transfusion. She stated that she had notified

9

Camacho of the lack of intravenous access and acted in Patient 2's best interest by prioritizing administration of other medications and that Camacho had agreed that she acted appropriately in doing so. In her written response to the charge, Williams stated that she did not believe that the patient's hemoglobin levels were critical enough to cause organ ischemia or organ failure and that the patient's hemoglobin levels showed improvement by the end of her shift without the blood transfusion, which she believed demonstrated that there was not a critical need for the transfusion.

Regarding the Board's charge that Williams failed to timely perform a glucose check on Patient 2, the complaint was that although the check was ultimately performed, it was performed outside the parameters of the doctor's order, and Williams did not document her reason for not performing the check during the ordered time frame. Evidence was admitted showing that Dr. Irvin Tantuco ordered that Patient 2 have routine blood glucose checks three times a day before meals and at bedtime. Thompson testified that the purpose for the blood glucose checks was to determine the proper insulin dose for Patient 2. Thompson stated that Patient 2 refused Williams's request to take the bedtime blood glucose check at 9:00 p.m. and explained that when that happens, standard nursing practice is to try to convince the patient to submit to the test or ask the family to try to get the patient's consent. If that fails, standard nursing practice is to notify other nurses and finally the physician, which Williams did not do. Thompson testified that Williams instead reviewed information from that morning's blood glucose check, which showed that Patient 2 had a blood glucose level of 68, and decided not to administer insulin at 9:00 p.m. At 3:05 a.m., Williams administered a blood glucose check at which time Patient 2's blood glucose level was 54, which Thompson stated was dangerously below the threshold level of 60. Thompson testified that Williams should have notified Patient

10

2's physician of the low blood glucose level, which she did not do. Thompson stated that blood glucose checks are important because that is the only way to know whether the patient needs insulin coverage, and Benton testified that without a blood glucose check it is impossible to know whether a patient's symptoms of confusion or combativeness are caused by a blood glucose level issue or something else.

Williams testified that she was aware that the glucose check was ordered for 9:00 p.m. but documented the check as "rescheduled" for a later time because Patient 2 refused to submit to the check. Williams stated that she believed Patient 2 would be more likely to agree to the check later on and that patients have the right to refuse any treatment or care and that forcing care on a patient would constitute assault. Williams also stated that the patient was not able to have anything by mouth and her previous blood glucose level was 68, so Williams made the decision to wait until later for another check, which, in her view, was acting for the benefit of the patient.

Regarding the Board's charge that Williams failed to document the medication list for Patient 3, the complaint was related to the transfer of a patient from a home or long-term care facility to the hospital, a process that includes doing what is referred to as medication reconciliation whereby a patient's medications from home or the long-term care facility must be recorded into the hospital's computer system as part of the admission process. Wang testified that the reconciliation process should be done within the first two to four hours of a patient's admission to the hospital and that it is the admitting nurse's responsibility to ensure that the medication reconciliation is done. Wang stated that this process is important because it ensures that a physician can review the patient's medications in time to continue, discontinue, or make

11

changes to them. Wang explained that although the process of keeping the medications list current is an ongoing process, the initial medications list should be done promptly.

On October 8, 2016, Wang received a complaint from Dr. Samani regarding one of his patients who had been transferred to Park Plaza to receive an upper level of care for sepsis. The physician reported that although the patient had arrived at Park Plaza at 11:00 p.m., the patient's medications were not reconciled until the following morning at 7:20 a.m., after Williams's 8-hour shift had ended. As a result, the patient missed a dose of antibiotic medication prescribed to treat sepsis. Wang stated that the physician was very angry about the delay in entering the patient's medications and complained that this was not appropriate care for a sepsis crisis.

Williams, to whom Patient 3 had been assigned, admitted to Wang that she had not reconciled the patient's medications but gave as a reason that the physician assistant who transferred Patient 3 to the hospital did not have hospital privileges. Williams stated that she could not administer medications prescribed by someone who did not have hospital privileges. Williams also told Wang that she was too busy that night to reconcile the medications and did not think she should have to ask her co-workers for help with that task. Wang explained that Williams should have performed the medication reconciliation by treating the medications list provided by the physician assistant as "home medications," which are listed in the medication record but not administered to the patient without orders from a doctor with hospital privileges. The intensive care physician on duty at Park Plaza told Wang that Williams carried out ventilation orders but the physician did not realize that Samani was waiting on the medication reconciliation to give orders regarding Patient 3's medications while at Park Plaza.

12

Wang testified that the delay in completing the medication reconciliation resulted in an unnecessary delay in treatment for Patient 3. Wang stated that Williams should have asked for help with completing the medication reconciliation if she was too busy but also disputed Williams's claim that she was too busy to complete the task during her shift. Wang noted that Williams had only one patient from 8:00 p.m. to 11:00 p.m. before receiving Patient 3 close to midnight and stated that one to two patients per shift was a regular load for an intensive care unit nurse.

Williams testified that she agreed that it is the admitting nurse's responsibility to complete the medications reconciliation but stated that this was a minor issue that should not have been reported to the Board. Williams stated that the patient arrived at the hospital with low blood pressure and tachycardia and that she prioritized making the patient comfortable and supporting the patient's blood pressure over the task of medication reconciliation or giving the patient an intravenous antibiotic.

Wang testified generally that Williams was regularly late coming to her shift and that Williams frequently did not take care of patients that Wang handed off to her when Wang's shift ended. Wang testified that she believed Williams did not pay attention to nursing details, although she acknowledged that Williams was a team player and frequently helped other nurses with their tasks. Wang stated that these positive attributes were off-set by Williams's failure to adequately care for her own patients. Wang said that Williams always had an excuse for mistakes she made or her failure to do something, which Wang believed demonstrated that Williams was unable to understand her nursing errors or accept responsibility for them. For her part, Williams testified that she had a "negative history" with Wang and was critical that Wang had written her up for the medications reconciliation issue.

13

After the two-day hearing, the administrative law judge (ALJ) issued her proposal for decision (PFD) with findings of fact and conclusions of law. The ALJ found that Williams (1) failed to follow a physician's orders to draw "stat" labs for Patient 1 and failed to communicate to the physician the reason for not carrying out his stat order, (2) failed to transfuse a unit of packed red blood cells to Patient 2 as ordered by a physician, (3) did not perform a bedtime glucose check for Patient 2 as ordered by a physician, and (4) failed to reconcile Patient 3's medications until eight hours after the patient had been admitted to the Park Plaza intensive care unit causing Patient 3 to miss a dose of an antibiotic. The ALJ found that "[t]here were multiple incidents in which [Williams] failed to carry out physician orders or made independent decisions about the care she thought appropriate for her patients" who, as intensive care unit patients were "particularly vulnerable due to their medical conditions." Based on her findings of fact and conclusions of law, the ALJ concluded that Williams should be issued a warning for one year, including stipulations that she attend remedial education in nursing jurisprudence and ethics, critical thinking, documentation, and professional accountability; that future employers should be notified of these stipulations; and that Williams should be indirectly supervised and required to send quarterly evaluations to the Board to ensure that she engaged in safe nursing practices. *See* Tex. Occ. Code § 301.453(a) (listing sanctions that Board may impose for violation of section 301.452(b)).

In its opinion and order, the Board adopted all of the ALJ's findings of fact and conclusions of law and her recommendation of a sanction of a warning with stipulations. The Board ordered Williams to take a course in nursing jurisprudence and ethics, a course called "Sharpening Critical Thinking Skills," a course in nursing documentation, and a course called "Professional Accountability." The Board's order also provided that, to complete its terms,

14

Williams must work as a nurse in the State of Texas providing direct patient care in a clinical healthcare setting for a minimum of sixty-four hours per month for one year, must give present and future employers a copy of the Board's order, must be supervised by a Registered Nurse who is on the premises, and must ensure that each employer submit periodic reports to the Board describing Williams's capability to practice nursing. The order stated that Williams could not be employed by a nurse registry temporary nurse employment agency, hospice, or home health agency. The order also provided that "upon compliance with the terms of this Order, all encumbrances will be removed from [Williams's] license to practice nursing in the State of Texas."

Williams sought judicial review of the Board's order. *See id.* § 301.555 (providing right to judicial review to "person against whom the board has taken adverse action under Texas Occupations Code chapter 301); Tex. Gov't Code § 2001.171 (providing right to judicial review to person "who is aggrieved by a final decision in a contested case"). Williams alleged that the Board's findings, inferences, conclusions, and decision were not supported by substantial evidence. Williams also alleged that the Board's findings, inferences, conclusions, and decisions were arbitrary and capricious and characterized by abuse of discretion or clearly unwarranted exercises of discretion because her former employer, Park Plaza, had refused her request that it conduct a peer review procedure, which she contends violated her right to due process. *See id.* § 2001.174 (allowing court to reverse and remand if "substantial rights of the appellant have been prejudiced" and, among other things, "the administrative findings, inferences, conclusions, or decisions are . . . not reasonably supported by substantial evidence . . . or arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion"). After a hearing, the district court affirmed the Board's order, and Williams

15

perfected this appeal. Williams's brief includes sixteen issues, which reduce to complaints that (1) the Board's findings are not supported by substantial evidence and (2) instead of granting her request for a peer review procedure, Park Plaza terminated her employment and reported her to the Board in retaliation for her having reported to the Board that Park Plaza violated the Act and deprived her of her right to due process, rendering the Board's decision to sanction her arbitrary and capricious and characterized by an abuse of discretion.[4]

## DISCUSSION

We first consider whether the Board's findings that Williams challenges on appeal are supported by substantial evidence. When reviewing an agency decision under the "substantial evidence" standard, we consider the reliable and probative evidence in the record as a whole. *See id.* § 2001.174(2)(E). We may not substitute our judgment for that of the agency and may only consider the record on which the agency based its decision. *Granek v. Texas State Bd. of Med. Exm'rs*, 172 S.W.3d 761, 778 (Tex. App.—Austin 2005, no pet.). "The true test is

---

[4] It in its appellee's brief, the Board argues that the trial court erred by denying its plea to the jurisdiction. Before the hearing, the Board filed its plea to the jurisdiction in which it asserted that Williams failed to exhaust her administrative remedies because she did not file a motion for rehearing with the Board before bringing her suit for judicial review. After a hearing, the district court denied the plea to the jurisdiction and stated during the hearing that it was doing so based on its determination that the Board's letter to Williams notifying her of her right to seek judicial review was insufficient to satisfy Williams's right to due process. *See Mosley v. Texas Health & Hum. Servs. Comm'n*, 593 S.W.3d 250, 254 (Tex. 2019) (holding that letter agency sent petitioner contained misrepresentations that resulted in denial of petitioner's due-process rights and directing agency to reinstate Mosley's administrative case to afford her opportunity to exhaust her administrative remedies by seeking rehearing of order entered against her). The Board did not seek review of the district court's determination that Williams's due process rights were violated either by filing an interlocutory appeal of the district court's order or by bringing a cross-appeal, nor did it complain of the district court's proceeding to the merits of Williams's suit for judicial review rather than directing the Board to reinstate Williams's administrative case to afford her the opportunity to seek rehearing of the order entered against her. *See* Tex. R. App. P. 25.1(c) ("A party who seeks to alter the trial court's judgment or other appealable order must file a notice of appeal.").

16

not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency." *Texas Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 452 (Tex. 1984). "The crux of a substantial evidence analysis is whether the agency's factual findings are reasonable 'in light of the evidence from which they were purportedly inferred.'" *Granek*, 172 S.W.3d at 778 (quoting John E. Powers, *Agency Adjudications* 163 (1990)). We presume that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the burden to prove otherwise is on the appellant. *Charter-Med.-Dall.*, 665 S.W.2d at 453. Therefore, if there is evidence to support either affirmative or negative findings on a specific matter, the decision of the agency must be upheld. *Id.* Finally, the agency's decision should be reversed only if the party challenging the decision demonstrates that the absence of substantial evidence has prejudiced that party's substantial rights. *Granek*, 172 S.W.3d at 778.

Williams first asserts that the Board's finding that she failed to draw a stat lab as ordered by a physician is not supported by substantial evidence. William does not dispute that she did not perform the lab draws within the time frame required for a stat order. However, she asserts that there is evidence in the record to support her theory that either (1) the physician actually ordered the lab draw as a morning lab draw rather than as a stat lab draw or (2) that the computer program defaulted systematically to identify the order as a morning lab draw rather than as a stat lab draw. Williams points to her testimony that she reviewed all the orders related to Patient 1 and that there was no record of stat lab orders being given or any printed label indicating that a stat lab should be drawn. Williams also asserts that there is evidence in the record that other nurses viewed the stat lab order "without a rational reason for doing so" providing "clear evidence that there was some possible manipulation of the record" that

17

"requires further investigation."  Finally, she argues that there is evidence in the record that she reviewed the pending orders at 7:50 p.m., which, in her view, demonstrates that she was in fact reviewing orders for Patient 1 despite the testimony that she did not open the separate Patient Activity List until the following morning.

It was undisputed that a stat lab draw is expected to be completed promptly in order for a doctor to quickly make an informed treatment decision and it is also undisputed that Williams did not draw the labs until almost twelve hours after they were ordered. There was also testimony that Dr. Vo ordered the labs as stat orders rather than as morning lab draws as Williams suggests.  In a contested-case hearing, the ALJ is the sole judge of witness credibility and is free to accept or reject the testimony of one witness or even accept "part of the testimony of one witness and disregard the remainder."  *Southern Union Gas Co. v. Railroad Comm'n*, 692 S.W.2d 137, 141-42 (Tex. App.—Austin 1985, writ ref'd n.r.e.).  We are not permitted to substitute our judgment for the ALJ's regarding the credibility of the witnesses. *Ford Motor Co. v. Texas Dep't of Transp.*, 936 S.W.2d 427, 429-30 (Tex. App.—Austin 1996, no writ).  "We must resolve evidentiary ambiguities in favor of the administrative order with a finding of substantial evidence to support the ALJ's decision."  *Granek*, 172 S.W.3d at 779. There was evidence that the lab draw was ordered as a stat lab draw and the ALJ was free to disregard or reject Williams's testimony that the physician actually ordered a morning lab draw or that the computer program malfunctioned to default the order to a morning lab draw.  In addition to witness testimony, the administrative record contains as an exhibit a printout of the Park Plaza orders for Patient 1 that includes an order entered at 7:37 p.m. on September 28th with the following details:  "Blood, Stat collected, Collection Date 09/28/16 19:37:00 CDT, Nurse Collect."  And, as Williams herself acknowledges in support of her claim to have

18

reviewed the orders, the printout indicates that Williams reviewed that order at 7:50 p.m., yet failed to take the lab draw until the following morning. Additionally, Williams's assertion that other nurses having accessed Patient 1's records demonstrates that the records were possibly manipulated is unsupported by any evidence in the record. We conclude that the finding that Williams failed to timely complete a stat lab draw as ordered for Patient 1 is supported by substantial evidence.

Williams next asserts that the Board's finding that she failed to transfuse a unit of packed red blood cells to Patient 2 was not supported by substantial evidence. Williams did not dispute that she never transfused the unit of blood. However, Williams argues that the evidence in the record does not support a finding that she did not notify Camacho that the transfusion was not done and that the record demonstrates that Camacho was "against the transfusion," was aware that the transfusion was not done and the reasons it was not done. Williams references Camacho's "Progress Notes" for Patient 2 in which he writes that "we decided against a PBRC transfusion based on poor access and priority to continue with Argatroban." The notes, however, are consistent with Camacho's testimony that when he ordered the transfusion, he realized that it could not be done because no intravenous access was available and he wanted to prioritize Patient 2's other medication over the transfusion. Camacho also testified that he believed the other medication should take precedence over the transfusion, he never wrote an order to discontinue the transfusion, he clarified that once there was a fixed intravenous access established through a central line he wanted the blood to be transfused, and that he believed that by the time he returned the next morning the patient had received the blood transfusion. There was also testimony that Williams admitted she had misread the transfusion order and that she did not believe that the patient actually needed the blood transfusion, which supports an inference

19

that her failure to do so was not based on instructions from Camacho but due to either a misunderstanding about the order or a unilateral decision to disregard the order despite her obligation as a nurse to follow orders or seek clarification rather than decide on her own not to follow them. We reject Williams's challenge to the finding that she failed to comply with a physician's order to transfuse a unit of blood to Patient 2.

Williams also asserts that the Board's findings that she failed to perform a blood glucose check on Patient 2 at bedtime as ordered by the physician; performed the blood glucose check at a different time; and failed to document the reason for not performing the check at bedtime or the reason for conducting the test at a different time are not supported by substantial evidence. Williams argues that her explanation that her decision to delay the check after the patient refused the procedure was a nursing decision that demonstrated her critical thinking because Patient 2 was not allowed to have anything to eat or drink before surgery and her respect for a patient's right to refuse any care, treatment, or procedure during hospitalization. Williams argues that Thompson was incorrect in testifying that the standard nursing practice when a patient refuses treatment is to talk to a family member to get consent for the patient to receive the treatment, try to get another nurse to perform the procedure, or call the physician. Williams maintains that Patient 2 did not suffer any harm as a result of the delay in checking her glucose and that the Board did not take into consideration that Patient 2 had the right to refuse care offered during hospitalization.

As previously noted, we are not permitted to substitute our judgment for the ALJ's regarding the credibility of the witnesses. *Ford Motor Co.*, 936 S.W.2d at 429-30. Thompson testified that, when Patient 2 refused treatment, Williams should not simply have "rescheduled" the important diagnostic for later but, instead, should have asked the family for

20

help in obtaining consent from Patient 2, or notified another nurse or the physician. There was also evidence that Williams did not attempt any of these actions and, additionally, when Williams performed the glucose check several hours later, the patient's glucose level was "dangerously low," a fact that Williams failed to report to a physician. Thompson also testified that low blood glucose levels could cause a patient to be confused or combative and it is important to determine whether observed confusion or combativeness is being caused by low blood glucose levels. In this instance, rather than attempt to ensure that Patient 2 was not refusing treatment due to confusion or combativeness induced by low blood glucose levels, Thompson simply referred back to an earlier blood glucose check, determined that Patient 2 did not need insulin, and performed the check later, which revealed dangerously low blood glucose levels. Even if, as Williams maintains, a patient has a right to refuse treatment, there was evidence that it was incumbent on Williams to at least inform another nurse or the physician that the patient had done so. We reject Williams's challenge to the findings related to the blood glucose check of Patient 2.

Finally, Williams asserts that the Board's finding that she failed to timely reconcile medications for Patient 3 is not supported by substantial evidence. Williams takes issue with the testimony that she was not too busy during her shift to reconcile the medications, asserts that there is evidence in the record that antibiotic therapy for the patient was discontinued on physician's orders such that the patient's missing a dose of antibiotic caused no harm, and that she was prevented from reconciling the patient's medications because the list provided was signed by a physician's assistant and, therefore, invalid. We have previously described the evidence the Board relied on to make its finding and, consistent with the substantial evidence standard of review, because there is evidence to support the Board's findings on this matter, we

21

must uphold its decision. *See Charter-Med.-Dall.*, 665 S.W.2d at 453. We reject Williams's challenge to the Board's findings regarding reconciling the medications list for Patient 3.

In addition to her evidentiary challenges, Williams asserts in this appeal that the Board's findings and decisions were arbitrary and capricious and characterized by abuse of discretion or clearly unwarranted exercises of discretion because her former employer, Park Plaza, had refused her request that it conduct a peer review procedure, which she contends violated her right to due process. Williams also asserts that Park Plaza's termination of her employment was in retaliation for her own complaints to the Board about Park Plaza's treatment of nurses in its employment. Assuming, without deciding, that Park Plaza had a statutory obligation to provide Williams with a peer review process, Park Plaza's failure to do so has no impact on our disposition of this suit for judicial review. The issue before us here is whether there was evidence in the record to support the Board's findings and conclusions, which we have determined there was. There is no allegation that the Board did not provide Williams with due process throughout its investigation of allegations that she violated the Act or at any point during the contested-case proceeding. To the extent Williams believes that Park Plaza failed to comply with its own obligations under the Act or any other statute related to a peer review procedure, that issue is separate and distinct from the Board's investigation of allegations that one of its licensees has failed to comply with standards of professional conduct. Williams has indicated that she reported to the Board that Park Plaza had not granted her request for a peer review procedure, and we presume that the Board has taken or will take whatever action is appropriate in response to that complaint. Similarly, to the extent Williams believes that the termination of her employment was in retaliation for her protected conduct, her remedy would be to pursue a claim for retaliatory discharge in the appropriate forum. In short, those issues are unrelated to,

22

and beyond the scope of, this suit for judicial review of the Board's order sanctioning a licensee for conduct it has determined constituted violations of the Act.

## CONCLUSION

For the reasons set forth in this opinion, we affirm the district court's order.

_____
Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Smith

Affirmed

Filed:   June 1, 2022